**TAN KIEN TU, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–97–00436–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 9, 2001.

Rehearing Overruled Nov. 29, 2001.

Mike DeGeurin, Winston E. Cochran, Jr., Houston, for appellants.

William J. Delmore, III, Houston, for appellees.

Panel consists of Justices LEE, DUNN, and AMIDEI.*

* Senior Justices Norman R. Lee, D. Camille Hutson Dunn and Former Justice Maurice E. Amidei sitting by assignment.

1. The companion cases are: *Jarnigan v. State,* 57 S.W.3d 76 (Tex.App.—Houston [14th Dist.] 2001); *Gonzalez v. State,* 63 S.W.3d 865 (Tex. App.—Houston [14th Dist.] 2001); *Gemoets v. State,* 14–97–0174–CR, —— S.W.3d ——, 2001 WL 893524 (Tex.App.—Houston [14th Dist.] 2001).

**OPINION**

AMIDEI, Justice (Assigned).

A Harris County jury found appellant, Tan Kien Tu, guilty of engaging in organized criminal activity and assessed his punishment at 99 years' imprisonment and a $10,000 fine. *See* TEX.PEN.CODE ANN. § 71.02 (Vernon 1994 & Supp.2000). The indictment alleged that Tu, with the intent to establish, maintain, and participate in a criminal combination or the profits of a criminal combination, committed the offense of theft of more than $200,000 from five specified insurance companies, over a period of approximately fifteen months, pursuant to a single scheme or continuing course of conduct. After the trial court denied a pretrial motion for severance, Tu's case was consolidated with co-defendants Thomas Henry Gemoets, Randy Jarnigan, Alfonso Gonzalez, and Leighann Phan.[1] In seven points of error, Tu argues that: (1) the conviction should be reversed because parts of the appellate record are missing; (2) the evidence is legally insufficient to support the verdict; (3) the trial court erred in denying his motion to quash the indictment; (4) the trial court erred in denying a severance; (5) the trial court erred in limiting cross-examination of Oscar Phu; (6) the trial court erred in prohibiting impeachment of Mong "Angie" Nguyen, an out-of-court declarant; and (7) Tu adopts points of error presented by other appealing defendants. We affirm.

**I.**

In his first point of error, Tu argues that the appellate record is incom-

plete, contending the large chart, the money trails book, and the audio tapes made by the undercover officer are missing. After submission of his brief, each of these items was forwarded for inclusion in the record. Accordingly, we overrule his first point of error.

## II.

In his second point of error, Tu argues the evidence is legally insufficient to support the jury's verdict. We disagree.

In reviewing legal sufficiency, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Margraves v. State,* 34 S.W.3d 912, 916 (Tex.Crim.App.2000). Thus, a "legal sufficiency of the evidence review does not involve any weighing of favorable and non-favorable evidence." *Cardenas v. State,* 30 S.W.3d 384, 389 (Tex.Crim.App.2000). Our legal sufficiency standard of review is the same for both direct and circumstantial evidence cases. *See Weyandt v. State,* 35 S.W.3d 144, 149 (Tex.App.—Houston [14th Dist.] 2000, no pet.).

Additionally, for the purpose of applying the *Jackson* legal sufficiency standard, the "essential elements" of the offense are those required by the "hypothetically correct jury charge." *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). The hypothetically correct jury charge is that which "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

A defendant commits the offense of engaging in organized criminal activity if, intending to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires to commit theft. Tex.Pen.Code Ann. § 71.02(a)(1) (Vernon 1994 & Supp.2000). A "combination" is defined as three or more persons who collaborate in carrying on criminal activities, although: (1) the participants may not know each other's identities; (2) membership may change from time to time; and (3) participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations. Tex.Pen.Code Ann. § 71.01(a) (Vernon 1994 & Supp.2000); *see Nguyen v. State,* 1 S.W.3d 694, 695 (Tex. Crim.App.1999). "[T]o commit the offense of engaging in organized criminal activity, the actor must not only agree to participate but must himself perform some overt act in pursuance of that agreement. Guilt requires two ingredients: (1) intent to participate in a criminal combination, and (2) the defendant's performing some act, not necessarily criminal in itself, in furtherance of the agreement." *Barber v. State,* 764 S.W.2d 232, 235 (Tex.Crim.App.1988).

Because direct evidence is rarely available to prove the existence of an agreement, circumstantial evidence is sufficient and is almost always needed. *See Burdine v. State,* 719 S.W.2d 309, 315 (Tex.Crim.App.1986). The fact finder may make its determination of the existence of an agreement based on events occurring before, during and after the commission of the offense and may rely on the actions of the defendant showing an understanding and a common design to do a criminal act. *See Beier v. State,* 687 S.W.2d 2, 4 (Tex. Crim.App.1985). It is permissible to infer an agreement among a group working on a common project when each person's action is consistent with realizing the common

goal. *See McGee v. State,* 909 S.W.2d 516, 518 (Tex.App.—Tyler 1995, pet. ref'd).

At trial, the following witnesses detailed how auto accidents were staged and how Tu orchestrated the forwarding of insurance claims to attorneys and physicians:

### Harris County Deputy Sheriff Charles Patberg

In March 1994, Patberg received information about possible insurance fraud from the Galveston County Auto Crimes Task Force. He began investigating, and, while undercover, ultimately met with several people who staged car accidents for insurance money. This group included Kenneth Johnson, Michael Ford, Angie Mong, and Mary Pressley, who, unbeknownst to the others, was a police informant. At this meeting, Patberg was given $130 to purchase car insurance on an undercover car. He also learned that Angie Mong, who was present at the meeting, was a leader of the group.

After purchasing the insurance policy, Patberg contacted Angie Mong, who initiated the plans for his accident. She explained that because his Safeway Insurance, which she called "bad" insurance, did not pay claims easily, his car would be the "girl" car in the accident. The "girl" car was the car that got hit in the accident, as opposed to the "boy" car, which hit the girl car and accepted fault for the accident. Mong instructed Patberg to have a minimum of four occupants in the girl car. In the boy car, there was normally just a driver.

Mong explained to Patberg that these accidents were staged in the following manner: a group member took the boy and girl cars to a secluded location and hit them together. He would then pick up the debris from the vehicles, take both vehicles to another intersection, position the cars, throw the debris in the middle of the road, and call the police. When the police arrived, the driver of the boy car would say something like, "I'm sorry, I ran the red light," or "I'm sorry, I didn't see the red light. I dropped a cigarette on the ground." The accidents were normally T-bone collisions. The boy car would always be the one at fault and would usually get a ticket.

On the evening of Patberg's accident, which Mong staged, the cars were positioned on the feeder road of the Gulf Freeway. After the accident, they pulled the vehicles to the side of the road. Mong then instructed the occupants of both cars to call the police and to blow their horn twice. When a Houston Police Department officer arrived, he issued the driver of the boy car a citation for running a stop sign.

After the staged accident, Patberg and the other participants went to a nearby restaurant and received partial payment for their involvement. Patberg received $600, which he split with everyone in his "girl" car. Further, while at the restaurant, Patberg and the other undercover officers completed a power of attorney form, which Mong provided. The form was blank, and Mong told them to just sign their names, but did not mention who the lawyer would be for their case.

Mong also instructed Patberg to go to a medical facility to see Dr. Thomas Gemoets. Without an appointment, he went to see Dr. Gemoets the next day. When he and the other car occupants arrived at the clinic, they told the receptionist that they were sent by Angie Mong. Office staff took Patberg's blood pressure and one x-ray. The car occupants, also undercover officers, did not have any x-rays taken. After his x-ray, Patberg went to see Dr. Gemoets in his office. Dr. Gemoets did not give Patberg any treatment, did not pre-

scribe any medicine, and did not even get out of his chair.

Several months later, Mong asked Patberg to return to Dr. Gemoets. After this visit, she asked Patberg and the other car occupants to go to another doctor's office because there had been a mix-up at Gemoets's office.

Thus, Patberg next visited Dr. Alfonso Gonzalez. Again, no appointment was necessary. Mong instructed Patberg and the other car occupants to speak to a "Leighann" upon arriving at Gonzalez's office. They went to Gonzalez's office, and the receptionist told them to sign in. After signing in, Patberg told the receptionist that "Angie sent us, and we need to see Leighann." The receptionist then scratched their names from the sign-in sheet and told them to go to a separate room. In this room, they met Leighann Phan.

Phan asked the officers to fill out the same type of paperwork that they filled out at the Gemoets clinic. Patberg testified that he and the other officers signed approximately 30 forms with Phan. After filling out the forms, Phan interviewed each officer individually. By this time, Angie had arrived, and she started reviewing medical charts. Finally, after filling out the forms, Patberg met with Dr. Gonzalez.

Gonzalez asked Patberg what had happened. Patberg told him that he was involved in an accident and was there for treatment. Patberg also told him where it hurt. Gonzalez asked Patberg to do some basic exercises, such as lifting his arms, rotating, and stooping. This examination lasted about five to ten minutes. Patberg also asked Gonzalez for medicine. When Gonzalez inquired what kind of medicine, Patberg asked for some "3s or 4s," meaning Tylenol 3 or Tylenol 4. After Patberg's request, Gonzalez gave him two prescrip-

tions. Gonzalez did not examine any of the other officers, did not prescribe any physical therapy, and did not request them to return for a follow-up visit.

After leaving Dr. Gonzalez and going to the room where they filled out their forms with Phan, Angie paid Patberg and the other officers. After seeing Gonzalez, Angie led Patberg into a small treatment area, where she treated him. Soon thereafter, the officers left the doctor's office.

Later, Angie called Patberg and told him to get the car estimated for the insurance company. Angie told Patberg that the car may need to be re-wrecked to make the damage look worse. Patberg contacted Safeway Insurance, who told him to bring the car in, and received an estimate on the car.

Subsequently, Patberg set up a second accident after being contacted by informant Mary Pressley. She told Patberg that Angie Mong wanted to promote her and make her a recruiter because she "had contact with good people."

Patberg supplied new undercover officers for Pressley's staged wreck. This next wreck took place in Pasadena and was a "T-bone" accident. Before the accident, the undercover officers met with the driver of the boy car at a restaurant in Pasadena. Here, they filled out powers of attorney and obtained partial payment on involvement in the accident. Patberg followed these officers in an undercover, officer-safety vehicle. After the accident, the officers returned to the restaurant. At that time, Angie Mong told the officers to go to a medical clinic.

The officers went to Dr. Gemoets's clinic the next day, wearing wires, which Patberg monitored. Afterwards, the officers regrouped at a local Texaco station and were paid for their doctor visits.

Patberg testified about a third accident staged in July 1994. After the accident, the undercover officer involved went to Dr. Gemoets's office. Again, Patberg monitored the wire the officer was wearing. Subsequently, this undercover officer met with attorney Randy Jarnigan to take a deposition about his accident for State Farm Insurance.

Finally, Patberg observed a fourth accident in August 1994. This wreck occurred at Don's Western Wear on the Gulf Freeway. After they met with the police at the accident scene, Mong paid the undercover officers for their participation. The next day, they went to Dr. Gonzalez's clinic. During this visit, Leighann Phan was the receptionist and appeared to be the office manager. After the visit, the officers were paid more money.

### Esmeralda Gordillo

Esmeralda Gordillo worked as a legal secretary for Ben Eustachon for three years. Tu had an office at Eustachon's and seemed to be the leader in the office. She testified that Tu worked at the office as one who would refer cases to Eustachon. She could identify a file as a Tan Tu file because Tu used a different client information form than Eustachon. Further, if Gordillo had a problem about a case, Eustachon would tell her to talk to Tu about it. She testified that it seemed as if Eustachon could not make a decision without Tu. She also noticed that when Tu was in charge of the office, there were always four claimants in every wreck.

Gordillo was later introduced to Angie Mong, whom Tu identified as his agent. Both Mong and Tu brought files to Eustachon's office.

When a case settled, Gordillo testified that Tu received the releases and checks signed by the clients. Different checks were subsequently written out to the clients and to the doctors for each's part. Tu picked up all the checks from the office.

### Thomas J. Pearson

Thomas J. Pearson was the supervising attorney for co-defendant Jarnigan, also an attorney, when Tu began to bring his office car wreck cases.

Tu was introduced as a paralegal working for another law firm. Tu informed Pearson that he had substantial contacts with owners of body shops, who had been for years referring him cases, that he was not satisfied with the service he was receiving at Eustachon's law firm, and that he wanted better lawyers. Soon after meeting Tu, Pearson agreed to work with him on his cases.

Pearson told Jarnigan how the cases would be handled. The information sheet about the clients would come from Tu. And Tu would have the clients sign the firm's power of attorney. Tu was paid hourly by Pearson because he considered Tu to be contract labor. It soon became clear to Pearson that Tu wanted one-half of the attorney's fees. Pearson told him he could not do this and he would have to accept his hourly rate. So, for seven months, Tu was not paid. Eventually, Pearson paid him about $30,000, which included a settlement Pearson obtained for Tu's own daughter.

Jarnigan oversaw the day-to-day operation of these cases. However, Pearson instructed Jarnigan to reject cases in which the insurance company requested a sworn statement from the client. In such instances, they returned the case to Tan Tu. Pearson believed that if the insurance company thought something was so odd as to request a sworn statement, it would be better for the firm's relationship with the insurance company to let those files go.

Ultimately, Pearson began to be suspicious about Tu's cases. In one case, Pear-

son wrote a demand letter to the insurance company and sent a copy to the clients. The father of one of the clients called and asked who Pearson was. When Pearson told him he was his son's attorney for his wreck, the father informed Pearson that his son had not been in any car wreck.

In another case, Jarnigan brought Pearson a case in which the insurance company alleged the accident had been staged. Pearson called the adjuster and subsequently sent the file back to Tu. In a third case, Pearson rejected a Tu case because it looked as though a double-impact had occurred, which was not the way the clients had described it. In a fourth case, which was sent back, the file showed that the clients were driving from Beaumont three or four times a week to see a doctor in Houston. Pearson found this unbelievable.

After the double-impact case, Pearson called Tu into his office and asked him for an explanation. Tu said he would have to discuss this matter with his "agent," Phu. Pearson "threw a fit" and asked Tu, "[w]hat do you mean by your f------ agent?" Tu did not respond. Pearson told Jarnigan that they couldn't be involved in cases like the double-impact case.

Later, after having a conversation with a lawyer from the State Bar's Unauthorized Practice of Law Committee, Pearson hired a private investigator to look at the overall picture of the Tan Tu cases. Pearson wanted a statistical analysis from the investigator because he thought these cases might be fraudulent. This analysis showed that there were a significant number of Tu cases that had four passengers in them. Eighty out of the ninety cases listed on the January 4, 1995 statistical report had three or four people listed as claimants. There were similar percentages of four occupant accidents on each statistical report included in the record. The analysis also showed that Pearson re-

jected 30 to 35 percent of the cases brought to him by Tu.

Pearson had several conversations with Tan Tu, saying he did not want to handle this business. He wanted to give the cases back, and he wanted Tu out of his office. Even after these conversations, Tu continued to come back to Pearson's office with more cases and files. And, for a time, Pearson continued to work on the Tu cases.

Pearson had a conversation with Jarnigan about whether Tu was running cases through his firm. In fact, on the side of one of the files from Pearson's office, Pearson testified that Jarnigan had written "Run offers by Tan Tu." Pearson said that Tu was asking for an amount of money that in his view amounted to fee splitting with a nonlawyer. He told Jarnigan that he couldn't associate with him.

Because Pearson couldn't get Tan Tu out of the office, he decided to leave. Jarnigan stayed at Pearson's old office, with all of the Tan Tu files. When Pearson left, seventy-five percent of Jarnigan's docket was the Tan Tu files. Pearson finally told Jarnigan that he didn't want to represent the Tan Tu clients because statistically it looked like there were too many questionable cases getting into the system.

When Tu found out Pearson was leaving, Pearson, who paraphrased Tu's language, testified Tan Tu told him: "Fine. Just don't f--- up the deal with Jarnigan. Let Jarnigan take the cases. You go on down the road."

After Pearson left this office, he came back several months later and found his name still on the door. Several letters had also been sent to insurance companies by Jarnigan's office, with Pearson's alleged signature. Pearson testified he had nothing to do with sending these letters.

Pearson testified that when he left his office, he felt he had lost control of his office to Tu. Pearson told Jarnigan that there were so many cases not passing the "smell test" that he could no longer "plausibly deny" that the source of the cases, Tu, should be cut off.

### Bryan Vaclavik

Bryan Vaclavik was a fraud investigator with the Harris County District Attorney's Office. He developed the *Money Trails* book, which was an exhibit in the cases covered under the indictment.

After analyzing Jarnigan's bank account, Vaclavik showed that he only received 16.67 percent of a settled claim. However, Jarnigan's power of attorney authorized him to receive 33.33 percent. Thus, Vaclavik concluded Jarnigan only received half of the attorney's fees. Because there were no checks written to Tu, Vaclavik inferred that Tu was paid half of the attorney's fees in cash.

Vaclavik also discussed Tu's tax records. In 1993, Tu reported income of $27,000. In 1994, he declared $41,000. He bought a Lexus for $33,000 cash and a Mercedes for $38,000 in 1993. In 1994, Tu and his wife purchased a $400,000 home in Sugar Land, paying $200,000 down in a cash payment. The money for the down payment came in differing amounts from Lee's Drive In,[2] Angie Mong, Diamond Dung, (Tu's sister-in-law) and Cong Tu (Mr. Tu's brother).

Tu had approximately seven bank accounts. His bank records show $500,005 in deposits, although tax returns only show $41,000 in income. Also, Vaclavik testified that based on his investigation, his expertise, and information presented to him in bank records, mortgage records, and doing-business-as records, the financier of the accident-staging-insurance-fraud group was Tan Tu.

### Oscar Phu

Oscar Phu testified that he was Tu's agent before Mong. Tu, a Republic of Vietnam army officer, came to Phu with the opportunity to make some extra money. Tu told him that he was working for an attorney and if Phu would refer him cases, he would get a referral fee. In early 1991, Tu gave him $200 to $300 per person, for each referral.

In 1992, Phu told Tu it was getting harder and harder to find referrals for car wreck cases. Tu told him that "in this kind of business you can create your own clients by making referral money." By late 1992, Phu was making enough money with clients of his own to quit his job as a vending machine operator. It was at this point he started creating referrals. Tu told Phu that if he would send people to him, he would take care of them and Phu would still get the referral money. Phu trusted Tu because once he would refer someone to him, he would get cash the next day. These people whom Phu referred to Tu would be used as passengers in "well planned accidents."

At the beginning, Phu was only a finder for Tu's organization. Later, he became an agent, which was a promotion by Tu. In order to become an agent, Phu had to fulfill Tu's need for people. As an agent, he had to recruit both the defendant and the plaintiff parties. This way on each claim, he could make money on both sides of the accident. Phu would also buy the parties' insurance policies. Tu also told Phu that the good policies of defendants, which he termed as the boy car, and then with the plaintiff, which he termed as the

---

2. In the eight cases relied on in the indictment, $218,000 of insurance money was cashed at Lee's Drive In, for which Tu's wife was listed on the "doing-business-as" form.

girl car. The passengers in the car were called by Tu "kids." And after the wreck, Tu would give Phu the name of a doctor for the clients to visit. Phu was instructed to look at the policies of the boy car to make sure he didn't get the ones who had a reputation of not paying claims. Tu stated that he preferred out-of-state insurance companies.

Tu explained to him how to stage the accident, though Phu did not stage the accidents directly. He ensured the participants had the proper policies. Tu would sometimes hold meetings to instruct Phu how to operate the business. For example, Tu explained he preferred the T-bone style of accident in which one car runs a stop sign and strikes the other car's passenger door. Tu gave Phu the information data sheets and the powers of attorney for the passenger-clients to sign. Phu testified that the information sheet was given to the attorney. Some of the information sheets had attorneys' names already on them. Some of the information sheets had Benjamin Eustachon's name on them.

Phu testified that Eustachon was an attorney, whom Tu called a "buddy" attorney. This meant that Tu considered Eustachon a quality attorney who would garner good settlements. Other lawyers Tu called trash attorneys. If the case was difficult to settle, it would be sent to a trash attorney. The buddy attorney would receive cases with three or four passengers and out-of-state insurance policies. Tu would have at least two attorneys-one for the boy car and the other for the girl car.

While working for Tu, Phu would sometimes transport clients to the doctor's clinics and mention Tu's name to the clinic staff. Tu told Phu that with different doctors, he got kickbacks of between forty and fifty percent of the payments the doctors received from the insurance settlement. Phu testified that the doctors were paid mostly in cash. Phu testified that Tu paid $70,000 for a clinic run by a Dr. Gemoets. Phu brought patients to Dr. Gemoets on a couple of occasions. When he got to the clinic, Phu would tell the personnel at the clinic that "Mr. Tan Tu sent me with the clients."

Tu also told Phu that if anybody would testify against him, that person would be dead before appearing in court.

Phu made approximately $100,000 in 1993. Tu would pay Phu four to six thousand dollars cash for Asian wreck participants; two to four thousand for Westerners, which were Caucasian and Hispanics. The payment was less for Westerners because, according to Tu, they talked more. Phu would share this money with the clients. He approximated that Tu made millions of dollars. Further, Tu told Phu that he used a check cashing service, which cost him two percent of what was cashed. Phu testified that Tu's wife was keeping the money for Tan. Every time Phu asked Tu for money for payment, Tu would have to go to his wife for the money. Tu's sister-in-law, Dung, came in from California to take charge of Tan's clinic where Dr. Gemoets worked.

Phu summarized Tu's organization: The clients-passengers received a third of the money, the attorney received a third, and the medical providers doctors Wasserstein and Tse received a third. The clients were usually paid in advance. Tu would get kickbacks of fifty percent from the attorney and fifty percent from the medical providers.

In 1993, Phu decided to work for a different wreck-staging operation. When Phu decided to leave Tu, Tu asked him to train a lady named Angie Mong to be his replacement. Tu paid Phu $1,000 to train her about insurance policies and how to

recruit clients. He taught her to carefully look at the policies of both parties and, if she recruited Westerners, to ensure they were younger than twenty-five. Older clients might have a better understanding of what was occurring. Phu also brought Mong to the car wrecks so she could witness how they operated.

### B.

■■■ Tu first argues that we cannot consider Oscar Phu's testimony because Phu is an accomplice witness and his testimony was not sufficiently corroborated.[3] We find that Phu was not an accomplice witness because he could not have been charged with the crimes with which Tu was charged.

■■■ A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. TEX.CODE CRIM.PROC. ANN. art. 38.14 (Vernon 1979). A person is an accomplice if he participates before, during or after the commission of a crime and can be prosecuted for the same offense as the defendant or for a lesser-included offense. *Medina v. State*, 7 S.W.3d 633, 641 (Tex.Crim.App.1999), *cert. denied*, 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000). A person is not an accomplice witness if he cannot be prosecuted for the offense with which the accused is charged. *Smith v. State*, 721 S.W.2d 844, 851 (Tex.Crim.App.1986). Whether the person is actually charged and prosecuted for his participation is irrelevant to the determination of accom-

plice status-what matters is the evidence in the record. *Matthews v. State*, 999 S.W.2d 563, 565 (Tex.App.—Houston [14th Dist.] 1999, pet. ref'd) (citing *Blake v. State*, 971 S.W.2d 451, 454–55 (Tex.Crim.App.1998)).

The indictment in the case alleged that Tu committed the organized criminal activity between October 9, 1993 and January 9, 1995. There is no evidence that Phu had any role in staging an October 9, 1993 accident or any subsequent accident. To the contrary, Phu stated that he was testifying only about events occurring before October 9, 1993. Thus, because Phu could not have been prosecuted for the offenses listed in the indictment, he was not an accomplice witness.

### C.

■■■ Next, Tu argues that the evidence is legally insufficient because the state did not prove that the theft was in a quantity in excess of $200,000 absent an instruction on the law of the parties. Although the law of the parties was not included in the charge, our review of the sufficiency of the evidence is governed by the hypothetically correct jury charge, which would have applied the law of the parties to the facts. *See Malik*, 953 S.W.2d at 240; *Weyandt*, 35 S.W.3d at 149. This hypothetically correct charge "is authorized by the indictment, does not unnecessarily increase the State's burden of proof or *unnecessarily restrict the State's theories of liability* and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240 (emphasis supplied).

■■■ Here, the record reveals that Tu employed Mong to recruit the participants

---

3. We note the jury charge included Phu's name in the accomplice witness charge. However, we do not consider Phu's inclusion in this portion of the charge as controlling our decision. The jury charge may not un-

necessarily enlarge the State's burden of proof. *See Malik*, 953 S.W.2d at 240. Thus, because a finding that Phu is an accomplice witness would do so, we are not controlled by the jury charge.

in the staged auto accidents and to coordinate the submission of insurance claims based upon their non-existent injuries. Patberg testified that Mong recruited him and several other officers to participate in the staged auto accidents. He also testified that she arranged for him and the other undercover officers to go to Gemoets and Gonzalez's clinics for treatment. Phu's testimony reveals that Tu employed Mong as an "agent" to operate a portion of his organization. Gordillo's testimony also revealed that Mong was Tu's agent. There was also testimony from Phu that Tu financed both Gemoets and Gonzalez's clinics, even going so far as to have Tu's sister-in-law move from California to operate Gemoets' clinic. Phu and Pearson's testimony also reveal that Tu retained the services of attorneys, such as Eustachon and Jarnigan, who submitted false insurance claims for both parties involved in the staged auto accidents. This evidence shows the connection between the money fraudulently received from the insurance companies by the attorneys and the money transferred to Tu from the doctor Gonzalez and attorneys as kickbacks.

The testimony and reams of documentary evidence link Tu to the operation of the auto-accident-insurance-fraud organization. Accordingly, after reviewing the evidence in the view most favorable to the verdict, we find there is sufficient evidence to support the jury's verdict.

### III.

In his third point of error, Tu argues that the trial court erred in overruling his motion to quash the indictment. In his motion to quash, he contended the indictment failed to provide: (1) the manner and means of each incident of theft; (2) any specific actions of Tu that constituted theft; (3) facts surrounding each incident of theft; (4) the names of all co-conspirators; and (5) any "overt act" performed by Tu or other co-conspirator.

 Tu argues that the indictment fails to provide the manner and means of each incident of theft. Tu also contends the indictment is defective because it does not give a more specific allegation of how the stolen money was "appropriated." Unless a fact is essential to notice, the indictment need not plead the evidence relied upon by the State. *Livingston v. State*, 739 S.W.2d 311, 321 (Tex.Crim.App. 1987). An indictment that tracks the language of the statute is legally sufficient and the State need not allege facts that are merely evidentiary in nature. *Id.* Additionally, in an organized crime case, the State need not allege the manner and means by which the underlying theft was committed. *Crum v. State*, 946 S.W.2d 349, 359–360 (Tex.App.—Houston [14th Dist.] 1997, pet. ref'd). There was proof of eight separate claims on staged collisions in various amounts and to different insurance companies. The indictment alleged one theft in the amount of $200,000 which is an aggregation of a series of thefts. Where there are several thefts pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense. Tex. Pen.Code Ann. § 31.09 (Vernon 1994). If the indictment alleges the theft was pursuant to one scheme and continuing course of conduct as in this case, the word "aggregate" or "aggregation" is not required. *Green v. State*, 880 S.W.2d 797, 800–801 (Tex.App.—Houston [1st Dist.] 1994, no pet.).

 Next, Tu asserts that the indictment is defective for failing to name all the co-conspirators and other members of the combination. An indictment for organized criminal activity alleging a completed commission of an offense need not set out the

names of the other members of the combination. *State v. Duke,* 865 S.W.2d 466, 468 (Tex.Crim.App.1993). We find the indictment in this case alleged a completed act of theft, and that the names of all the co-conspirators were not required. *Id.*

■■■ Tu also contends that the indictment was defective for failing to allege an "overt act" committed by him or a co-conspirator or member of the combination. When the State alleges that a defendant has committed, rather than conspired to commit, one of the enumerated offenses, there is no requirement that the State allege or prove the existence of any overt acts. *See Duke,* 865 S.W.2d at 468. Because Tu's indictments allege that he committed the specific offense of theft, the State was not required to plead or prove any overt acts.

We hold that Tu's indictment was not defective and that it provided him with all the notice required by law. Furthermore, Tu has failed to demonstrate that he was harmed as a result from lack of notice of what the State intended to prove. Accordingly, we overrule his third point of error.

### IV.

In his fourth point of error, Tu contends the trial court erred in denying his motions to sever his case from his co-defendants. He argues that the disparity of culpability between the defendants and the high probability of confusion by the jury severely prejudiced him.

> Two or more defendants who are jointly or separately indicted or complained against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further, that in cases in which, upon timely motion to sever, *and evidence introduced thereon,* it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

TEX.CODE CRIM.PROC. ANN. art. 36.09 (Vernon 1981 and Supp.2000) (emphasis added).

■■■ Appellant failed to offer any evidence to the trial court to support his claims of prejudice and jury confusion. At the pretrial hearing on the motions to sever, the trial court advised the parties it would carry the motions with the trial and allow the parties to urge them during the trial. Appellant argues the trial court's error in not granting a severance was a continuing one, and the decision should be viewed in light of all the evidence, not just what was discussed prior to trial.

■■■ The mere allegation that prejudice will result is not evidence of or sufficient showing of prejudice required under Article 36.09. *Mulder v. State,* 707 S.W.2d 908, 915 (Tex.Crim.App.1986). A timely motion for severance under article 36.09 must be made prior to the announcement of ready for trial. *Foster v. State,* 652 S.W.2d 474, 477 (Tex.App.—Houston [1st Dist.] 1983), *aff'd.* 693 S.W.2d 412 (Tex. Crim.App.1985). Furthermore, if no evidence is offered in support of the motion to sever, the trial court does not err in overruling the motion. *See Sanne v. State,* 609 S.W.2d 762, 776 (Tex.Crim.App.1980); *Crum,* 946 S.W.2d at 366; *Fisher v. State,* 681 S.W.2d 202, 206 (Tex.App.—Houston [14th Dist.] 1984, pet. ref'd). Thus, because appellant failed to provide any evidence to support his motion to sever, either at the pretrial hearing thereon or

during the trial, we hold the trial court did not err in denying severance.

Accordingly, appellant's fourth point of error is overruled.

## V.

In his fifth point of error, Tu argues that the trial court erred in limiting cross-examination of Oscar Phu. During his cross-examination of Phu, Phu stated the following:

[Appellant's counsel]: Did you make a written statement on February 23rd, 1995?

Phu: That was the statement that you have in your hand. There was sort of a kidnapping with HPD.

After this statement, appellant's counsel asked the following question:

[Appellant's counsel]: Now, I want to make one thing clear, and I'm not going to go into this incident. I just want to make sure that one thing is understood. You don't contend that Tan Tu had anything to do with this incident, do you?

THE COURT: I'm not going to permit you to go into that now. Don't answer that question.

The trial court did not permit appellant's counsel to further cross-examine Phu about the kidnapping. Outside the presence of the jury, Phu stated he did not know whether appellant was involved in his kidnapping. The trial court ruled that the kidnapping topic was off-limits, and instructed the jury to disregard Phu's unresponsive reference.

 Appellant contends the lack of additional cross-examination regarding Phu's kidnapping permitted the jury to infer that someone on trial was involved with the kidnapping. Furthermore, because Tu was the only defendant on trial who dealt with Phu, the jury would infer appellant kidnaped Phu. Specifically, appellant claims, "[w]ithout the forbidden cross-examination, the jury was left with an impression that the appellant was a man of violent action, not just violent words."

 The Sixth Amendment protects the defendant's right not only to confront the witnesses against him, but to cross-examine them as well. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Hoyos v. State,* 951 S.W.2d 503, 506 (Tex.App.—Houston [14th Dist.] 1997), *aff'd,* 982 S.W.2d 419 (Tex.Crim.App.1998). The accused is accorded great latitude in showing witness bias or motive to falsify testimony. *Knox v. State,* 31 S.W.3d 700, 702 (Tex. App.—Houston [1st Dist.] 2000, no pet.). The extent of this cross-examination, however, is not unlimited. The trial court retains wide latitude to impose reasonable limits on cross-examination. *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986); *Carroll v. State,* 916 S.W.2d 494, 498 (Tex. Crim.App.1996). The trial court must carefully consider the probative value of the evidence and weigh it against the risks of admission. *See Hodge v. State,* 631 S.W.2d 754, 758 (Tex.Crim.App. [Panel Op.] 1982). These potential risks include "the possibility of undue prejudice, embarrassment or harassment to either a witness or a party, the possibility of misleading or confusing a jury, and the possibility of undue delay or waste of time." *Id.;* Tex.R.Evid. 403. A trial court may exclude evidence being elicited during cross-examination on the basis that the prejudicial effect of such evidence clearly outweighs its probative value. *Nevels v. State,* 954 S.W.2d 154, 157 (Tex.App.—Waco 1997, pet. ref'd). The trial court's decision to limit cross-examination is not subject to reversal absent a clear abuse of discretion. *Love v. State,* 861 S.W.2d 899, 903 (Tex.Crim.App.1993). Whether the

trial court abused its discretion depends on the facts of the case. *Id.*

The Confrontation Clause does not guarantee that every prosecution witness will refrain from giving testimony that is marred by forgetfulness, confusion or evasion. *Delaware v. Fensterer,* 474 U.S. 15, 18–19, 106 S.Ct. 292, 293–94, 88 L.Ed.2d 15 (1985). The Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and examine these infirmities through cross-examination, thereby calling to the fact-finder's attention the reasons for giving scant weight to the witness' testimony. *See Dedesma v. State,* 806 S.W.2d 928, 931 (Tex.App.—Corpus Christi 1991, pet. ref'd). A Confrontation Clause violation does occur when a defendant is prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1436.

Here, the trial court found that the probative value of Phu's ambiguous answer was clearly outweighed by the potential for unfair prejudice and the confusion of the issues before the jury. Thus, because a trial court may limit the cross-examination of a witness if the prejudicial effect clearly outweighs its probative value without violating a criminal defendant's constitutional right to confrontation of witnesses, *see Nevels,* 954 S.W.2d at 157, we find the trial court, in this situation, did not err in limiting Phu's cross-examination.

Accordingly, we overrule appellant's fifth point of error.

## VI.

In his sixth point of error, Tu argues that the trial court erred in prohibiting impeachment of Mong "Angie" Nguyen, an out-of-court declarant. We find appellant has presented no record for our review of this point of error.

The excluded documents are not included in this record. During the appeal process, Tu was adjudicated an indigent. Because of his indigent status, he was entitled to a free record. During the hearing where Tu was declared indigent, the trial court discussed the status of the record:

MR. DEGEURIN: Can you tell the Court what you think would be necessary for a complete record at this time?

MR. COCHRAN: All those documents along with a usable copy of the charts. For example, Mr. Blizzard and Miss Goode, who tried the case, used a great big chart trying to show Mr. Tu was a head of the octopus by putting a picture of the house Mr. Delmore alluded to at the top of the chart that then had pictures of other people—

THE COURT: Are those in the record?

MR. DELMORE: The chart was forwarded to the Court of Appeals in its entirety. It's not even here. The Court of Appeals has the chart.

THE COURT: If they already have them, they are a part of the record.

MR. DEGEURIN: Someone apparently requested it specifically, and they sent it up there because it wasn't part of the record.

MR. COCHRAN: All the documents have to go in, every page of it, because without it we're going to get back to the same old problem. They'll say maybe page 10 of this document had the sufficient evidence.

MR. DEGEURIN: *We'll agree to every document referred to by any witness. Let's do it that way.*

THE COURT: That's what I was going to order. I'm going to order every document referred to by a witness be made part of the record; if Mr. Tu is indigent, that the county pay the court reporter for preparing that.

MR. DEGEURIN: Could we have one finding for protection? Documents not referred to by witnesses but may have been dumped in the jury room that the State will never argue that those documents that were not made the record would have made the evidence sufficient. Can we have that agreement?

MR. DELMORE: When you say referred to by a witness, if a witness identified it and then it was offered and admitted, then you want it, right?

MR. DEGEURIN: Right.

4. Additionally, this court entered the following order stating that only documents admitted into evidence would be made part of the record:

> On August 13, 1998, this Court entered an order directing the judge of the 337th District Court to conduct a hearing to determine whether appellant should be provided a copy of the exhibits that were admitted at trial, and whether the copies should be prepared without cost to appellant. On January 8, 1999, the Honorable Jon Hughes conducted a hearing pursuant to this Court's order, and a record of that hearing was filed with this Court on January 20, 1999. At the hearing, the court determined that appellant is indigent. *The court further ordered that every document referred to by a witness and admitted into evidence be made a part of the record* and that the county pay the court reporter for preparing the supplemental reporter's record. The court directed appellant's counsel to make arrangements with the court reporter for filing the supplemental reporter's record. To date, no supplemental reporter's record has been filed.

MR. DELMORE: You want everything that was admitted?

MR. DEGEURIN: Yes.

MR. DELMORE: I'm not going to complain about the lack of anything that was not admitted.

THE COURT: That will be the order of the Court, that the county pay for that.

MR. DELMORE: Pay the court reporter I presume?

THE COURT: Yes.

Tu's attorney did not request the Court to make these excluded documents a part of the record. In fact, Tu's attorney agreed that only the documents referred to by witnesses, which would not include documents attacking Angie Mong's credibility because she did not testify, were to be included in the record.[4] Additionally, there was no written request made to make these excluded documents a part of the record. *See* TEX.R.APP.P. 34.6(b)(1).

> Accordingly, on July 1, 1999, we ordered Gina Bench, the substitute court reporter for the 337th District Court, to prepare, certify and file in this Court, without cost to appellant, a supplemental reporter's record containing a copy of all documents admitted into evidence in the trial of this case. *See* Tex.R.App. P. 34.6(d). Pursuant to the order of the trial court, Gina Bench is to paid by Harris County for preparation of the supplemental reporter's record, in accordance with local procedures. We ordered the supplemental reporter's record to be filed with this Court on or before August 2, 1999. To date, no supplemental reporter's record or motion for extension of time has been filed.
>
> We order GINA BENCH, the substitute court reporter for the 337th District Court to file the supplemental reporter's record in this appeal on or before November 29, 1999, or appear before this court, on a date certain to show cause why you should not be held in contempt for not filing the record in appeal number 14–97–00436–CR; *Tan Kien Tu v. The State of Texas,* as ordered.
> PER CURIAM

Thus, because Tu agreed the missing documents were not to be included in the record and there was no specific request for the Angie Mong documents, he may not complain that the documents are missing from the record. *See Gomez v. State,* 962 S.W.2d 572, 576–77 (Tex.Crim.App.1998). Accordingly, because Tu has failed to present anything for our review, we overrule his sixth point of error.

### VII.

In his seventh point of error, Tu attempts to adopt all points of error raised by each of his co-defendants. We are not required to examine any brief, other than Tu's, to evaluate whether his conviction should be reversed. *See DeJesus v. State,* 889 S.W.2d 373, 380 (Tex.App.—Houston [14th Dist.] 1994, no pet.); *Francis v. State,* 746 S.W.2d 276, 278 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd). Additionally, this point of error does not comply with Appellate Rule 38.1(h), which requires "clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX.R.APP.P. 38.1(h). Accordingly, we overrule his seventh point of error.

Having overruled each of Tu's points of error, we affirm the judgment of the trial court.