MEMORANDUM OPINION




No. 04-03-00803-CR



George Warren INGRAM,


Appellant



v.



The STATE of Texas,


Appellee



From the 186th Judicial District Court, Bexar County, Texas


Trial Court No. 2002-CR-2096


Honorable Maria Teresa Herr, Judge Presiding



Opinion by: Alma L. López, Chief Justice


Sitting: Alma L. López, Chief Justice

 Catherine Stone, Justice

 Karen Angelini, Justice


Delivered and Filed: January 5, 2005


AFFIRMED

 George Warren Ingram was convicted by a jury of theft of services. On appeal, Ingram
contends: (1) the trial court violated his right to confrontation by limiting cross-examination; (2) the
evidence is legally and factually insufficient to support the jury's verdict; and (3) the trial court erred
in admitting evidence in violation of Rule 404(b). We affirm the trial court's judgment.


Background


 Stanley Burchett, a certified public accountant with Hanke, Green and Stein (the "Accounting
Firm"), became aware that Ingram was interested in obtaining his firm's services in September or
October of 2000. On March 14, 2001, Ingram met with Burchett, Dan Hanke, Norris Harrell, and
Mike Beuerlin to discuss the reason Ingram wished to retain the Accounting Firm's services. Prior
to the meeting, Burchett had conversations with Ingram and exchanged e-mails with him. On the day
of the meeting, Ingram signed an engagement letter setting forth the services to be provided and the
hourly rates charged for the various accountant levels within the firm. The engagement letter, various
invoices, and time and billing records from the Accounting Firm were introduced into evidence. The
Accounting Firm estimated that the first phase of the work Ingram was requesting would cost
approximately $10,000.00, and the engagement letter required a retainer in that amount to be paid
before work was to begin.

 Burchett testified that the total cost of phase one was actually $10,588.00. Burchett spent
approximately 45 hours working on the project, and Burchett's hourly rate was $127.00 per hour,
for a total cost of approximately $5,800.00. After the engagement letter was signed on March 14,
2001, Burchett was required to prepare for his deposition to be taken the following Monday with
regard to the work the Accounting Firm was engaged to perform. Burchett testified that his
appearance at the deposition was discussed at the meeting on March 14, 2001. During the course
of preparing for the deposition, Burchett and Hanke continually communicated with Ingram, and
Burchett understood that Ingram was aware of the substance of the testimony that Burchett intended
to provide at his deposition.

 Burchett testified that after finishing the deposition, Ingram told him he had done a good job
and that he appreciated his work. Burchett denied that Hanke was the person who the parties agreed
would attend the deposition. Burchett stated that no surprise was expressed when he appeared for
the deposition. Burchett stated that at the conclusion of the meeting on March 14, 2001, everyone
understood that Burchett would be the one deposed.

 On March 20, 2001, Burchett discovered that Ingram's retainer check had been returned by
the bank because the account on which the check was drawn was closed. Burchett left Ingram a
message on his voice mail and sent Ingram an e-mail message. Ingram responded by e-mail indicating
he was unaware the account was closed and inquired about which bank had returned the check.
Burchett responded by providing the bank name, the check number, and the account number. Ingram
stated that he would replace the check and inquired about whether Burchett had received a purchase
order from his accounting department.

 Burchett received a subpoena for his testimony at an arbitration hearing scheduled for May
14, 2001. Burchett e-mailed Ingram, informing him of a conflict and the firm's policy not to testify
without having been paid. Ingram responded that he would contact Hanke.

 Michael Sorbeck, a branch manager and custodian of records for Wells Fargo Bank, testified
regarding the status of the account Ingram used in writing the check to the Accounting Firm. On
November 18, 2000, the account had a negative balance of $1,374.50. On December 19, 2000, the
account had a negative balance of $3,700.31. On January 19, 2001, the account had a negative
balance of $7,261.47. On February 20, 2001, the account had a negative balance of $7,273.47. On
March 12, 2001, the account had a zero balance because the negative balance was "charged off,"
meaning the bank took a loss on that amount, and the account was closed. 

 Sorbeck testified that Ingram would typically receive notices each time a check was processed
for insufficient funds. When an account remains continually overdrawn, Wells Fargo sends a letter.
In addition, Ingram would receive monthly bank statements reflecting the current balances. The
checking account was tied to a savings account; however, the savings account was closed on
December 19, 2000. Ingram would have received notice when the savings account closed. Sorbeck
stated that the monthly bank statement reflecting the closing of the checking account would have been
mailed on March 20, 2001, or March 21, 2001.

 Records were introduced showing that Ingram had another account with Wells Fargo on
which he wrote a check for $33,300.00 to Triple A for arbitration services on May 11, 2001.
Subsequent evidence was introduced to show that the account used for the check written to Triple
A was closed on January 11, 2001, and the check did not clear Wells Fargo.

 Sorbeck further testified that deposits were being made into the account used to write the
check to the accounting firm but those deposits were subsequently being returned. As a result, the
account would temporarily have a positive balance until the deposit item was returned. Evidence was
introduced to show that Ingram deposited money into the account by depositing checks drawn on
Citibank into the account; however, the Citibank checks were subsequently returned for insufficient
funds and the account was debited for the deposit previously credited. On cross-examination,
questions were raised regarding whether the Citibank checks could be matched to the bank statement
for the account in question.

 Carl James Weyrich, a criminal investigator with the district attorney's office, testified that
several letters were sent to Ingram in an effort to obtain payment on the check written to the
Accounting Firm. In addition, Weyrich contacted Ingram by telephone and e-mail. Ingram never told
Weyrich that the money was not owed. In fact, Ingram acknowledged that the money was owed.
Weyrich attempted to collect payment for several months.

 Ingram testified that he first met with the Accounting Firm on March 14, 2001. Ingram stated
that his attorney engaged the firm. Ingram understood that Hanke was the person who had been
engaged. Hanke was to provide expert testimony regarding the damages Ingram sustained in another
lawsuit. (1) Ingram testified that Hanke had been designated as an expert in the lawsuit and a subpoena
had been issued for Hanke to be deposed. Ingram stated that Hanke was the only person in the
meeting during the morning of March 14, 2001. Shortly before lunch, Hanke produced an
engagement letter for Ingram to sign. Ingram stated he would sign the letter, but the client was
actually a corporate entity and Hanke would need to produce an invoice and to obtain a purchase
order. After lunch, Burchett joined the meeting; however, Ingram was never informed that Burchett
would be the person to be deposed. Ingram discovered Burchett would be deposed when he arrived
for the deposition. Ingram stated that Burchett was not an expert in the area and his testimony was
"off the wall." Ingram stated that at the time he wrote the retainer check to the Accounting Firm, he
was not aware the account had been closed. On cross-examination, Ingram denied that he waited
until five days before the deposition to retain the Accounting Firm so that the firm would not have
notice that the check was returned until after the deposition. Ingram stated that the accounts
connected to the account on which he wrote the check had sufficient funds to cover the check.
Ingram admitted that he subsequently wrote a letter enclosing a subpoena for Burchett to testify;
however, Ingram stated the subpoena was for Burchett to testify as an adverse witness not with
regard to the damage issue. Ingram later clarified that Burchett was subpoenaed because Ingram
believed the Accounting Firm defrauded him. Ingram stated that he only listened to the information
Weyrich gave him and did not offer his defense to the payment of the check. Ingram admitted that
he e-mailed Burchett that he would replace the check without making any reference to being
dissatisfied with the work.

 Based on the evidence presented, the jury found Ingram guilty of theft of services. Ingram
appeals.

Sufficiency of the Evidence


 In his second and third points of error, Ingram challenges the legal and factual sufficiency of
the evidence to support his conviction. Specifically, Ingram contends that "although there is evidence
that [Ingram] did not pay the Hanke Firm, there is no other evidence that would indicate or prove
that, at the time the check was written, he did not intend to pay the Hanke Firm." In addition, Ingram
contends that the State failed to prove the value of services provided by the Accounting Firm.

 In reviewing the legal sufficiency of the evidence, we view the evidence in the light most
favorable to the prosecution to determine whether a rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319
(1979). In our factual sufficiency review, we must consider all of the evidence to determine whether
the judgment is "so contrary to the overwhelming weight of the evidence to be clearly wrong and
unjust." Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). The trier of fact evaluates
the credibility and demeanor of the witnesses and determines the weight to be given contradictory
testimony. Cain v. State, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997). We are not permitted to
reweigh the evidence, rather we defer to the trier-of-fact's findings, particularly those based on
credibility determinations. See id. at 407-09.

 A person's intent may be inferred from circumstantial evidence such as the acts, words, and
conduct of the accused. Bustamante v. State, 106 S.W.3d 738, 740-41 (Tex. Crim. App. 2003);
Williams v. State, 82 S.W.3d 557 566 (Tex. App.--San Antonio 2002, pet. ref'd). In this case,
evidence was introduced that the account Ingram used to write the check had a negative balance since
October of 2000. Additional evidence was introduced to show that Ingram engaged in questionable
actions in an effort to write checks on the account by depositing checks from other accounts that did
not have sufficient funds to cover the deposited checks. Sorbeck testified regarding the standard
banking practices and the numerous letters Ingram would have received regarding the account,
including the bank statements that showed the negative balance. Finally, the jury may have inferred
from the timing of Ingram's engagement of the Accounting Firm's services that Ingram intended to
have the deposition services performed before the dishonored check was discovered. Sufficient
circumstantial evidence was introduced from which the jury would have determined that at the time
Ingram wrote the check he did not intend to pay for the Accounting Firm's services.

 With regard to the value of the services, the evidence was conflicting. Burchett testified that
Ingram complimented him after the deposition, while Ingram stated that Burchett's testimony was
worthless. The billing records were introduced to show the cost of the services, and Burchett
testified regarding the number of hours he spent and his billing rate. In resolving the conflict in the
testimony regarding the value of the services provided, the jury may have considered the subsequent
e-mails between Burchett and Ingram in which Ingram did not express any dissatisfaction. The jury
may also have considered that Ingram did not question the value of the services when confronted by
Weyrich. We defer to the jury's evaluation of the credibility of the witnesses in concluding that the
evidence is legally and factually sufficient to establish that the value of the Accounting Firm's services
was $1,500.00 or more but less than $20,000.00. 

 Ingram's second and third points of error are overruled.

Confrontation


 In his first point of error, Ingram contends that he was denied his due process and
constitutional rights to a fair trial because he was denied the ability to properly cross-examine a
witness and present his defense. The State responds that Ingram failed to preserve error with regard
to his contention that his constitutional rights were violated because he failed to object to the
exclusion of the testimony on that basis and his theory of admissibility asserted in his brief differs from
his theory of admissibility at trial.

 In order to properly analyze this issue, we must begin with the testimony that was presented
in Ingram's bill of exception as this is the only excluded testimony for which error has been preserved.
See Tex. R. App. P. 33.2; see also Shafer v. State, 82 S.W.3d 553, 555 (Tex. App.--San Antonio
2002, pet. ref'd) (noting excluded evidence must be brought forward either through a timely offer of
proof or a formal bill of exception in order to preserve error). In his bill of exception, Ingram's
attorney questioned Burchett regarding his knowledge of the amount of money Ingram invested in
the transaction that led to the damages that Burchett was retained to calculate. (2) When Ingram's
attorney attempted to go into this line of questioning at trial, the State objected to the evidence as not
being relevant. Ingram's attorney responded that the evidence went to the value of the services
provided because the questions were intended to test whether Burchett understood the transaction.
After the bill, Ingram's attorney re-urged that he be permitted to present the testimony to the jury
regarding Burchett's understanding of the amount Ingram was to invest. The trial court sustained
the State's objection on relevancy grounds. Accordingly, the only issue properly presented for our
review is whether the trial court erred in refusing to permit Ingram's attorney to ask Burchett
questions relating to the amount of money Ingram put up in the transactions. See Wilson v. State,
71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (point of error on appeal must comport with the
objection made at trial).

 The United States Constitution's Confrontation Clause affords criminal defendants with the
right to confront the witness against them. Lagrone v. State, 942 S.W.2d 602, 613 (Tex. Crim. App.
1997). Importantly, this confrontational guarantee includes the right to conduct all legally proper
cross-examination. Lagrone, 942 S.W.2d at 613. "However, the trial court also maintains broad
discretion to impose reasonable limits on cross-examination to avoid, inter alia, harassment, prejudice,
confusion of the issues, endangering the witness, and the injection of cumulative or collateral
evidence." Lagrone, 942 S.W.2d at 613; see also Tan Kien Tu v. State, 61 S.W.3d 38, 53 (Tex.
App.--Houston [14th Dist.] 2001, pet. ref'd). The trial court's decision to limit cross-examination
is not subject to reversal absent a clear abuse of discretion. Tan Kien Tu v. State, 61 S.W.3d 38 at
53. Whether the trial court abused its discretion depends on the facts of the case. Id.

 In this case, the trial court was clear from the beginning of the trial that questioning regarding
the pending civil lawsuit in which Burchett's services were provided was to be limited. The trial court
stated, "I do not want to relitigate or go over your disagreement with - what's happening on the civil
side is not going to be solved over here by dragging it into the criminal matter." Ingram's attorney
responded that he would need to introduce evidence that Hanke was intended to be deposed not
Burchett and that Burchett's lack of preparedness damaged Ingram's case. The trial court agreed that
Ingram could explore the issue in a very limited sense by explaining what happened at the deposition.

 The trial court permitted substantial questioning into whether Hanke was intended to be
present at the deposition as opposed to Burchett. The trial court also permitted questioning into
whether Ingram believed Burchett had provided valuable services. The testimony was conflicting.
After hearing the testimony regarding the nature of Ingram's investment, the trial court could have
determined that this questioning would not benefit the jury. Burchett responded to the questioning
by discussing the investment in general terms but further responded that it would take a substantial
time to "regurgitate" the exact nature of the investment that took him five or six days to analyze and
put together. In view of the testimony, the trial court was within its discretion in determining that
the questioning would confuse the issues or inject cumulative or collateral evidence.

 Ingram's first point of error is overruled.

Rule 404(b)


 In his final point of error, Ingram contends that the trial court abused its discretion in
admitting Rule 404(b) evidence. Specifically, Ingram complains of the admission of the Citibank
checks and the testimony that the deposits in the Wells Fargo account were returned when the
Citibank checks were not honored. In the argument in his brief, Ingram jumps from arguing Rule
403, to arguing admissibility under Rule 404(b), to arguing that the trial court should have given a
sua sponte limiting instruction to limit the jury's consideration of the evidence. At trial, Ingram's
attorney raised two objections: improper predicate and improper admission of extraneous offense
evidence. In his brief, Ingram alludes to the State's ability to link the Citibank checks with Ingram's
Wells Fargo account; however, Ingram does not assert an issue regarding whether a proper predicate
was shown. Having reviewed the objections made at trial and the arguments made in the brief, we
conclude the only issue presented for our review is whether the trial court erred in overruling trial
counsel's objections to the evidence regarding the deposit of the Citibank checks into Ingram's Wells
Fargo account and the subsequent debits to that account when those checks were returned.

 A trial court's Rule 404(b) ruling is reviewed under an abuse of discretion standard. Page
v. State, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004). Under Rule 404(b), evidence of other crimes,
wrongs, or acts may be admissible for purposes other than character conformity such as preparation,
plan, knowledge, or absence of mistake or accident. Tex. R. Evid. 404(b). Rebuttal of a defensive
theory is also one of the permissible purposes for which relevant extraneous evidence may be
admitted under Rule 404(b). Moses v. State, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003).

 In this case, Ingram denied knowing that the Wells Fargo account was closed or that he
otherwise did not intend for the check to pay for the services. As a result, the State was required to
rely on circumstantial evidence to show Ingram's knowledge. The Citibank checks were important
proof to establish the manner in which Ingram attempted to falsely inflate the balance of the Wells
Fargo account. This evidence showed Ingram's knowledge that checks written on the Wells Fargo
account would not have sufficient funds to cover them. Accordingly, the trial court did not abuse its
discretion in overruling Ingram's Rule 404(b) objection.

 Ingram's fourth point of error is overruled.

Conclusion


 The trial court's judgment is affirmed.

 Alma L. López, Chief Justice


DO NOT PUBLISH


1. In the lawsuit, Ingram asserted legal malpractice claims against a law firm arising from a foreign exchange
currency transaction.
2. BILL OF EXCEPTION


 Q. Mr. Burchett, we're now outside the presence of the jury. Do you recall, earlier, I had attempted to ask
you some questions about how much money Mr. Ingram was investing in the foreign exchange currency transaction?

 A. I remember something about that, yes.

 Q. And do you remember how much money he was investing in it?

 A. No sir; I don't. I remember the fact that you were going [to] ask the question, I don't remember how much
he was going to invest.

 Q. Well, was it just a few dollars, or was it in the millions of dollars or?

 A. Well, I guess you can draw some conclusions, if our fifty-four - if we had a damage number of Fifty-four
Million, you know, there had to be some type of investment larger than that in order to make Fifty-four Million. But,
beyond that, I don't recall.

 Q. But you remember you testified, in your deposition, about what he was investing in it, didn't you?

 A. I don't remember.

 Q. Do you recall that Wells Fargo Bank was also investing in that foreign currency exchange transaction?

 A. I do recall that there was some - some kind of communication about Wells Fargo supposed to be involved
in these investments to some degree. I don't recall exactly what they meant.

 Q. Let me show you, Mr. Burchett, your deposition of March 19th. And do you remember you had a sheet,
this sheet that was your analysis that was presented at the deposition.

 A. Yes. Okay.

 Q. Can you look at this and from that determine how much George Ingram was investing in that foreign
currency exchange transaction?

 A. Okay. It's been a good while since I have looked at this, so I'm not real fresh about this. But there is a
margin account that was being invested, which would be borrowed funds. Appears to be totaling three different
investments. This is what would have happened in this scenario. This actually never transpired, this transaction never
happened. But the margin investments were alleged to have been Thirty-two Million Dollars. There is a leverage
portion for a Hundred Twenty-eight Million Dollars.

 And I can't - I don't recall exactly what the leverage portion was, just sitting here today, which would make
the total - what's called hedged investment here on this spreadsheet, of a Hundred-sixty Million Dollars, both being
what was borrowed and then also this leverage portion, whatever that means.

 Q. All right. So the leverage portion was a portion that would be coming from borrowed funds; isn't that
correct?

 A. As I said, I don't remember exactly what the leverage portion was.

 Q. Well, can't you look at your worksheet there and figure it out?

 A. Sir, I'm not going to take what took five or six days to analyze and put together to be deposed, I'm not
going to take five minutes, right here, right now, and regurgitate all of this. It's not going to happen.

 Q. All right. I believe that's all I have on the bill, Your Honor.