2) Caption, civil cases



COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS




FELIPE T. CASTILLO,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee.
§


 


§


 


§


 


§


 


§


 


 § 


No. 08-02-00199-CR



Appeal from the


106th District Court


of Gaines County, Texas 


(TC# 01-3112)


O P I N I O N


 Felipe T. Castillo appeals from his conviction for engaging in organized criminal
activity. We affirm.Facts

 On February 5, 2000, four men in a green Saturn drove down Avenue J in
Seminole, Texas, stopped in front of the Ensor family residence, and fired bullets into the
house and a pickup truck that was parked in front. Defendant Felipe T. Castillo was in
the car's backseat.

 Details of the events preceding the shooting came from defense witness Anthony
Jameal Savage, one of the men in the car. Savage testified that he is from Hobbs, New
Mexico, and had known Castillo for five or six years by the time of trial. On February 5,
2000, Savage was at his girlfriend's apartment in Hobbs when Castillo arrived with Dante
Alexander Canava and Jesse John Barrientes III in a green Saturn. They asked him to
help them move furniture at Barrientes' mother's house. Savage agreed, and
accompanied them to Seminole.

 Canava was driving, Castillo was behind him, Savage was in the front passenger
seat, and Barrientes was behind him. The four remained in these positions whenever in
the car. They talked about girls and why Savage was no longer in a gang. Barrientes had
not joined a gang. Nobody mentioned any drive-by shooting. When the four men were
near the Wal-Mart in Seminole, Savage saw Castillo pull out a black .22 caliber, and
Barrientes pulled out a silver .25 caliber automatic. When Savage asked what they were
doing with the guns, "they said--said that if anybody messed with us they were going to
dump on them." He explained, "Like they was going to shoot somebody, you know."

 Castillo bought bullets for the two handguns. They then left and Barrientes gave
directions to Canava as he drove to Barrientes' mother's house. Barrientes and Canava
helped move boxes while Savage and Castillo were in the house. While they were
driving to his grandmother's house, Barrientes asked if the others wanted "to go to the
country to shoot the guns." When they arrived at the house, nobody was at home, so they
headed back into town. As they approached the city limits, Castillo and Barrientes began
loading the guns. The two in the backseat then switched guns and Castillo cocked the
gun Barrientes gave him and placed it on the seat next to Canava. Barrientes then gave
Canava directions. When the car arrived at the Ensor residence on Avenue J, Canava
said, "Forget it," and started firing the gun out the window. Barrientes pushed Savage's
seat forward and began firing over the top of the car. The windows were rolled down. 
Savage had rolled down the window on his side of the car because he was smoking a
cigarette. Castillo did not shoot a gun, but when Savage protested he called Savage a
"punk." Canava and Barrientes emptied the clips of their guns into the house and vehicle. 
The home and yard appeared occupied at the time of the shooting.

 During all of this, Castillo was wearing red and white. Red is the color of the
Bloods street gang and Castillo is a member of the East Side Bloods. Savage testified
that often initiation into a gang required the candidate to do a drive-by shooting, take a
beating, commit a burglary, or do some other type of criminal activity. Immediately
before the shooting, Castillo tied a red bandanna around his head. This signifies that he
was "ready to start some trouble with somebody else in a different gang." Barrientes tied
a white bandanna around his head. One cannot wear the gang colors unless they are a
member of the gang. Booking sheets at the Gaines County Sheriff's Department reveal
that Castillo and Canava are members of the East Side Bloods, but Barrientes and Savage
show no gang affiliations. Both Castillo and Canava had a number of gang tattoos. 
Although Savage was no longer a gang member, he still had a gang tattoo.

 When shots were fired, the Ensor family were in their house. Ensor's youngest
daughter had a friend over from across the street. After the shots, the neighbor girl's
mother Janet Smith ran out to see what had happened. She heard the sound of a car
"peeling out," and saw a "dark colored sporty car with a finned back" going around the
corner. Marvin Ensor came out of his house and asked Ms. Smith what had happened. 
She said she did not know, but then she saw that the window of his pickup truck had been
shot out and other bullet holes and told Ensor that it appeared that someone had shot his
car. She then went back into her house and called 911.

 Texas State Trooper Juan Gabriel Medrano responded to a report of a "possible
description of the vehicle as a late or early model blue Camaro, dark blue Camaro, with a
spoiler on the trunk." Medrano waited on Highway 385 toward Odessa. He waited
around twenty minutes, then started back to Seminole. As he drove, he spotted a dark
green Saturn with a spoiler on the back. He saw four men inside looking over at him. As
he followed the vehicle, the right rear passenger kept turning back to look at him. He also
noticed the other rear passenger was wearing a red hat with a red bandanna underneath
and a red shirt, indicating to him that the passenger was a member of the Bloods. This
was significant because members of gangs such as the Bloods "tend to do acts of violence
such as drive-by shootings."

 As Medrano followed, he noticed "movement" inside the car. This movement is
partially explained in the testimony of Savage. He testified that after the officer was
behind them, Castillo and Barrientes wiped the guns off. This, Savage believed, to
remove fingerprints. While Medrano was following the Saturn, Castillo told Canava to
run from the police. Savage told him not to run because he was going to tell the police
that he did not have anything to do with the shooting. Savage testified that Castillo told
him that "they was going to take me out if I did."

 Medrano followed the vehicle to a residence on County Road 406, the home of
Barrientes' grandparents. All four men exited the Saturn and "started making a beeline
straight for the house without looking over at [Medrano]." The officer called them over. 
He could smell the odor of alcohol. He let Barrientes knock on the door of the house, but
no one was home. The suspects were then separated from one another. When the officer
looked in the windows of the Saturn, he could see a pair of black gloves, two boxes of
Remington ammunition, and a knife in the driver's door bin. Medrano did not search the
car.

 Soon thereafter, Sergeant Pipkin of the Seminole Police Department arrived. The
Ensor neighbor, Ms. Smith, came with him and identified the vehicle. Smith said the
vehicle was similar to the one she had seen, but she was not positive. Sergeant Pipkin
then exited the vehicle and asked Canava for the keys to the Saturn, and Canava gave him
keys to a Honda that would not open the car. When Canava denied knowing where the
keys to the Saturn were, Sergeant Pipkin opened the vehicle with a slim jim. In the
search, he found the black pair of gloves, a butcher's knife in the driver's door bin, a Colt
.22 caliber automatic, a Raven Arms .25 caliber automatic, two boxes of Remington .22
caliber ammunition in the mesh holder behind the driver's seat, another box of .25 caliber
ammunition, and two magazines in the glove box, one with .22 caliber bullets, the other
with .25 caliber bullets. The mesh holder was directly in front of where Castillo was
sitting. The .25 caliber handgun was concealed in the backseat under the plastic console. 
The .22 caliber Colt was concealed between the seat and the plastic molding in the
backseat of the car on the driver's side. No fingerprints were recovered from the
handguns. The spent shell casings recovered from the scene of the shooting matched the
firearms recovered from the green Saturn.

 The .22 caliber Colt was identified as stolen by the Federal Bureau of Alcohol,
Tobacco and Firearms. The defense objected to this on grounds that it would bring
extraneous offenses into testimony and was prejudicial to Castillo. In place, the defense
offered a stipulation that Castillo owned the Colt .22 and knew how to use it. The State
argued that since the gun was stolen, Castillo could not properly stipulate to ownership. 
The trial court did not allow the stipulation, and allowed proof of extraneous offenses
because "its presence would make the Defendant's criminal intent more likely than would
be assumed in its absence."

 Billy Triplett is a member of the Hobbs, New Mexico Police Department. He
testified that he encountered Castillo on October 11, 1999, when he responded to a report
of gunshots being fired in Hobbs. He identified Castillo's weapon. Officer Triplett
initially returned the gun to Castillo. Later, Robert Garner claimed the firearm. Garner
was called to testify that the Colt .22 automatic in this case was the same that was stolen
from his store on August 30, 1999. Garner testified that two men, Michael Pittman and
Andre Evans, stole the gun, but he had no idea how the gun made its way to Castillo and
Castillo's acquisition of the gun could have been innocent. Evans and Pittman were
identified as gang members. Garner's shop was in an area that had a lot of graffiti
concerning the East Side Bloods.

 Detective John Beasley of the Midland Police Department testified that the Bloods
engaged in a number of criminal activities, including "vandalism, narcotics use and
distribution, assaults, homicides, aggravated assaults, extortion, money laundering,
conspiracy." He also testified that the Bloods would be considered a "combination"
under the Texas definition. He explained the colors and tattoos that show Bloods
affiliation. On cross-examination, Detective Beasley admitted that he was not familiar
with the particular subset of the Bloods in Hobbs, but was working from information
provided by the prosecution.

 Officer Robert Weaver of the Hobbs Police Department testified that he met 
Castillo while investigating a drive-by shooting on October 27, 1996. Castillo was
eventually found responsible for that drive-by and was sentenced to two years in the New
Mexico School for Boys.

 The jury found Castillo guilty of engaging in organized criminal activity. They
imposed the maximum punishment for a second-degree felony, twenty years' confinement
and a fine of $10,000.

The indictment for engaging in organized criminal activity need not plead

the manner and means by which the underlying offense was committed

 Castillo's first point of error urges his indictment failed to allege the manner and
means of committing the offense of deadly conduct. This was error, he argues, because
there are three ways that deadly conduct can be committed and he had no way of knowing
which he was expected to defend against, nor the punishment to which he was exposed. 
The potential punishment for an offense of engaging in organized criminal activity is
directly linked to the commission of the underlying crime. Actual commission, as
distinguished from conspiracy to commit, is one punishment category higher than the
most serious offense listed in the statute. Tex. Penal Code Ann. § 71.02(b) (Vernon
2003). The underlying offense here is that of deadly conduct, which can either be a Class
A misdemeanor or a felony of the third degree. Tex. Penal Code Ann. § 22.05(e)
(Vernon 2003). Thus, a conviction for engaging in organized criminal activity for the
commission of deadly conduct could bring punishment for either a state jail felony or a
felony of a second degree, depending upon which provision of section 22.05 is violated.

 Nevertheless, in an organized criminal activity case, the State need not allege the
manner and means by which the underlying offense was committed. Crum v. State, 946
S.W.2d 349, 359 (Tex. App.--Houston [14th Dist.] 1997, pet. ref'd) (citing Lucario v.
State, 658 S.W.2d 835, 837 (Tex. App.--Houston [1st Dist.] 1983, no pet.)); State v.
Rivera, 42 S.W.3d 323, 329 (Tex. App.--El Paso 2001, pet. ref'd); Tu v. State, 61 S.W.3d
38, 51 (Tex. App.--Houston [14th Dist.] 2001, pet. ref'd). In the face of a timely motion
to quash the indictment, the indictment must allege only those facts necessary to show
that the offense was committed, to bar a subsequent prosecution for the same offense, and
to give the defendant notice of precisely what is being charged. Rivera, 42 S.W.3d at 329
(citing Bynum v. State, 767 S.W.2d 769, 778-79 (Tex. Crim. App. 1989)). An indictment
that tracks the language of the statute is legally sufficient and the State need not allege
facts that are merely evidentiary. Id. A motion to quash should be granted, however, if
the facts sought are essential to give notice. Id. If the facts sought are not essential in this
way, the indictment need not plead evidence relied on by the State. Id. The question,
therefore, is whether the defendant's motion to quash sought facts that were essential to
give notice. Id.

 To determine this, we look to the relevant caselaw. Crum, Rivera, and Tu all dealt
with underlying offenses of theft. Like deadly conduct, the grade of punishment in a theft
conviction is related to the details of that underlying theft. Tex. Penal Code Ann. §
31.03(e), (f) (Vernon 2003). Castillo offers no argument distinguishing these cases, nor
indeed does he discuss their relevance at all. We conclude the same analysis applied in
those cases applies here.

 Castillo's indictment tracks the penal statute prohibiting engaging in organized
criminal activity. See Tex. Penal Code Ann. § 71.02(a)(1) (Vernon 2003). The
indictment was required to and did allege only that: (1) Castillo, along with Canava, 
Savage, and Barrientes, actually committed the underlying offense of deadly conduct on
February 5, 2000, and (2) that each did so with the intent to establish, maintain, or
participate in a combination. See Rivera, 42 S.W.3d at 329 (citing State v. Duke, 865
S.W.2d 466, 467-68 (Tex. Crim. App. 1993)). This was sufficient notice. The first point
of error is overruled.

Failure to object to alleged error in indictment waives complaint

 In his second point of error, Castillo claims error in the indictment's failure to set
out the acts relied upon to prove recklessness under Tex. Code Crim. Proc. Ann. art.
21.15. We find Castillo has waived error on this point. Specifically, Castillo's motion to
quash the indictment did not mention the failure to allege the acts of recklessness. Failure
to object prior to trial to a substantive defect in the indictment forfeits the right to raise
the objection on appeal. Tex. Code Crim. Proc. Ann. art. 1.14 (Vernon 1977); Studer v.
State, 799 S.W.2d 263, 268, 273 (Tex. Crim. App. 1990). The second point of error is
overruled.

Improper prohibition on question to venire panel was harmless

 In his third point of error, Castillo complains that the trial judge improperly
prohibited his counsel from individually examining prospective jurors on the State's
burden of proof beyond a reasonable doubt. During voir dire, Castillo's counsel
attempted to ask each prospective juror if he or she would require the State to prove each
element of the offense beyond a reasonable doubt, including a specific question on the
element of intent. After asking two of these prospective jurors, he was stopped by the
judge and forbidden from "committing" individual jurors. For the following reasons, we
find any error was harmless.

i. standard of review

 The trial court has broad discretion in the process of selecting a jury. Sells v. State,
2003 WL 1055328, at *3 (Tex. Crim. App. 2003); Allridge v. State, 762 S.W.2d 146, 167
(Tex. Crim. App. 1988). Generally, we leave the propriety of a particular question to the
trial court, absent an abuse of discretion. Barajas v. State, 93 S.W.3d 36, 38 (Tex. Crim.
App. 2002) (citing Allridge, 762 S.W.2d at 163; Faulder, 745 S.W.2d at 334). A trial
court's discretion is abused only when a proper question about a relevant area of inquiry
is prohibited. Id. (citing Allridge, 762 S.W.2d at 163).

ii. the questions in the context of the voir dire

 Dan Sullivan, counsel for Castillo, asked venire persons Clark and Cosby whether
they would require the State to prove the element regarding the culpable mental state
required in order to find Castillo guilty. After speaking with venire person Clark, the trial
judge warned that "We can't be committing the jurors." She then suggested that Sullivan
ask if the panel members could "follow the instructions." Sullivan continued his
questioning by asking venire person Cosby if she would require the State to prove that 
Castillo "committed the offense of deadly conduct knowingly or intentionally?" After she
responded that she would, the trial judge called him up and prohibited the line of
questioning. Crutchfield, the attorney for another defendant, offered an alternative
question:

 MR. CRUTCHFIELD: What if I just make a suggestion that you ask the
jury after discussion here with these two ladies is there anyone that if the
State fails to prove their case beyond a reasonable doubt with regard to
what the Court requires will you have any problem with acquitting the
Defendant? I mean, that's just a suggestion. However you want to do it. 


The trial judge agreed that she would "have no problem with that." Sullivan then voiced
his dissatisfaction with the ruling. The trial judge responded:

 THE COURT: You can do one of two things, as far as the Court goes. You
can ask the question as Mr. Crutchfield indicated, which is basically asking
the same thing. Everybody out there has heard it now. You can ask
everybody as a whole. That will be allowed.


 MR. SULLIVAN: Okay.


 THE COURT: But we're not going to keep going down the list and
committing each single person. And the proper question in the Court's
opinion is whether they will follow the instructions given to them by the
Court, and use the evidence that was presented here and hold the State to
the standard of proving beyond a reasonable doubt each and every element
of what is there.


This Court must note that although the trial court allowed Sullivan to do "one of two
things," it offered only one option. Whereas we agree that the trial court could require
Sullivan to ask his question of the venire panel as a whole, we cannot agree that the
question the trial court offered was the proper question to which Sullivan should have
been limited. Speaking with the panel, Sullivan found some venire members had attitudes
that he was obligated to pursue:

 MR. SULLIVAN: . . . You see, the point I'm trying to make is that even if
Mr. Castillo was a member of a street gang, or a member of something
called the Bloods, or the East Side Bloods, or the West Side Bloods, or
Latin Nation, or is that--that doesn't mean that he's guilty of everything that
comes along when he's there, does it? Am I wrong about that? Is there
anyone that believes that just the fact that you're a member of a--one of
these criminal street gangs, as they're defined, makes you guilty of every
offense that happens when you're there? Is there anyone that believes that? 
You're all pretty quiet.

 

 UNIDENTIFIED JUROR: I think it does.


 MR. SULLIVAN: You think it does?


 UNIDENTIFIED JUROR: Yeah. Because it's who you associate with. 
Like you said, he wasn't a gangster 24 hours a day, but what you are inside
is what you're going to be 24 hours a day, whether you're with--


Shortly thereafter, another juror offered her opinion:

 JUROR LUETTA ROBISON: Well, I'm Luetta Robison. I just think
whoever you run around with--I mean, the type of people you run around
with, you kind of know what they're going to do, or what they're capable of
doing. And I don't know. I just--


 MR. SULLIVAN: If that's an element of the offense--I mean, it's not an
element of the offense. Engaging in organized criminal activity only comes
into play after you determine whether or not the Defendant is guilty of
shooting the gun in the house, of doing the deadly conduct thing, okay. Are
you going to use the fact that he was a member of a street gang to determine
whether he was guilty or innocent of that offense? That's the question--the
question in the case. I mean, you know, we might as well shut down and go
home if the jury is going to impose a greater burden than the law is.


 JUROR LUETTA ROBISON: I don't know.


 MR. SULLIVAN: Well, we're going to have to find out from everybody,
because, you know, this young man is--has liberty. . . . Let's start--let's just
start at the front and work our way back, because it's real important we do
that. Your name is Ms. Clark?


 Sullivan then turned to venire person Lillie Clark:

 MR. SULLIVAN: Do you--if the evidence shows that Felipe belonged to
some outfit in Hobbs called the East Side Bloods and that he was in the car
when this drive-by, as it has been popularly characterized, occurred, what
proof are you going to require before you find a verdict of guilty?


 JUROR LILLIE CLARK: What proof?


 MR. SULLIVAN: Yes, ma'am.


 JUROR LILLIE CLARK: I have to go first with physical proof. You
know, if he was there, was he a member, where was he in the car, how
many guns were used, how many bullets were shot, what did the police do
to investigate the situation, what's their testimony, what's the testimony of
the people that--the victims, what's--


 MR. SULLIVAN: Would you require--when I talk about elements, would
you require that the State--Mr. McCrary prove that the Defendant--that Mr.
Castillo knew that these guys were going to shoot the gun before the guns
were shot?


 JUROR LILLIE CLARK: Well, yes. But how would they prove that?


 MR. SULLIVAN: I don't know. But the burden is on them to prove it.


 JUROR LILLIE CLARK: If they can prove their case.


 MR. SULLIVAN: Well, okay. Let's investigate it some more. Not only do
they have to prove it, they have to prove it beyond a reasonable doubt.


At this point, the judge warned Sullivan not to commit the jurors. Sullivan then asked
venire member Clark: "I guess what I'm asking you is can you follow that part of the
Court's charge where it says that you must find that Felipe Castillo intentionally or
knowingly committed the offense of deadly conduct?" After she responded that she
could, he followed up:

 MR. SULLIVAN: But what I'm getting at is one of the elements of the
offense is that you know that he committed the offense of deadly conduct
intentionally or knowingly, okay.


 JUROR LILLIE CLARK: Uh-huh.


 MR. SULLIVAN: That's an element the State must prove. Can you go
along with that?


 JUROR LILLIE CLARK: Yes.


 MR. SULLIVAN: Beyond a reasonable doubt?


 JUROR LILLIE CLARK: Yes.


Sullivan asked a very similar question again, then asked, "Okay. Unless you find beyond
a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the
Defendant of engaging in organized criminal activity." To which Ms. Clark replied,
"Yes, I could do that."

 Sullivan then turned to Juror Jane Cosby with an abbreviated version of the same
question:

 MR. SULLIVAN: . . . Ms. Cosby, you heard me go over all this with Lillie. 
I guess I'm asking you, can you follow the Court's charge and require the
State to prove intentionally or knowingly beyond a reasonable doubt?


 JUROR JANE COSBY: Yes, sir.


 MR. SULLIVAN: Whether it's two ways to commit the offense, or
whether it's engaging as part of a group, or as a member of a street gang?


 JUROR JANE COSBY: Yes, sir.


 MR. SULLIVAN: You'll still require the State to prove that--that he
committed the offense of deadly conduct knowingly or intentionally?


 JUROR JANE COSBY: Yes, sir.

 

 MR. SULLIVAN: Okay, Now, thank you.


 THE COURT: Mr. Sullivan, the Court is going to interrupt again. Would
you please approach the bench.


 MR. SULLIVAN: Yes, ma'am.


 (At the Bench, on the record.)


 THE COURT: I do not want these jurors committed on every single one of
these. And I think that you can ask the same question and get the--what you
need to know by asking them as a whole if there is anyone who will not
follow the instructions.


 MR. SULLIVAN: I don't want to ask them as a whole. If the Court
instructs me to do that, I would ask for an opportunity to have the jury
excused where I can make my bill. He's been up there for three and a half
hours, and he asked every conceivable thing of the jury, and went into great
detail, and I have the obligation of protecting my client. And I'm going to
do it if I can.


 THE COURT: I understand that, Dan. I understand it well. But at the
same time you are trying to individually commit, on certain items, each one
of the jurors, and I think that you can very well cover it just as well if you
will ask them if they will follow the instructions of the Court, if they will
follow the law as it is given to them in the instructions, and if they will
require what the Court instructs them to, and uphold the State to that
standard or not.


 MR. SULLIVAN: I disagree with the Court, and I want to make a bill if
you stop me. 

After a discussion at the bench, Sullivan asked the general "following instructions"
question of the panel as a whole. Answers were derailed when a juror reported that
another said, "He is guilty and they need to prove him innocent."

iii. Standefer v. State and questions of commitment

 A voir dire question is proper if it seeks to discover a juror's view on an issue
applicable to the case. Barajas, 93 S.W.3d at 38 (citing Smith v. State, 703 S.W.2d 641,
643 (Tex. Crim. App. 1985)). While Castillo did not have a right to have a particular
juror on his jury, he did have a right to "not have a particular venire member on the jury if
the venire member is challengeable for cause or the defendant exercises one of his
peremptory challenges." Johnson v. State, 43 S.W.3d 1, 6-7 (Tex. Crim. App. 2001). 
However, an attorney cannot attempt to bind or commit a prospective juror to a verdict
based on a hypothetical set of facts, even if the question is otherwise permissible. 
Standefer v. State, 59 S.W.3d 177, 179-80 (Tex. Crim. App. 2001) (citing Allridge v.
State, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991), cert. denied, 510 U.S. 831, 114 S.Ct.
101, 126 L.Ed.2d 68 (1993)). Commitment questions are those that commit a prospective
juror to resolve, or to refrain from resolving, an issue a certain way after learning a
particular fact. Id. at 179. Recognizing that the law requires jurors to make certain types
of commitments, the Court of Criminal Appeals has stated that not all commitment
questions are improper. Id. at 181. For example, jurors are required to follow the law
enacted by the Legislature so a prospective juror must be able to consider the full range of
punishment provided for an offense or be challengeable for cause. Id. However, where
the law does not require the commitment, a commitment question is "invariably
improper." Id. To be proper, then, a commitment question must contain only those facts
necessary to test whether a prospective juror is challengeable for cause. Id. at 182. The
Court of Criminal Appeals explicitly set out the inquiry that we use in analyzing
commitment questions:

 So, the inquiry for improper commitment questions has two steps: (1) Is the
question a commitment question, and (2) Does the question include facts--and only those facts--that lead to a valid challenge for cause? If the answer
to (1) is "yes" and the answer to (2) is "no," then the question is an
improper commitment question, and the trial court should not allow the
question.


Id. at 182-83.

iv. analysis of the question

 Sullivan's questioning of venire persons Clark and Cosby attempted to discover
whether they would follow the court's charge with regard to the mental element of the
offense. This was particularly appropriate after opinions were expressed that simply
showing gang membership was enough to hold Castillo responsible for the gang's
actions.

 We believe this line of questioning was proper. It did not try to commit the jurors
to a particular verdict. Rather, it pointed out the requirement that the jurors consider the
mental element of the offense. The questions do not try to establish facts as determinative
in the minds of the potential jurors. The answer would lead to a proper challenge for
cause if the persons would not be able to hold the State to the appropriate standard of
proof on the mental element of the offense, and it added no facts that were unnecessary to
ferret out whether a challenge for cause was necessary. Standefer, 59 S.W.3d at 181-83. 
Moreover, the question suggested by the trial court does not strike to the heart of what 
Sullivan was needed to impress upon the jury. We therefore find that the trial judge
improperly prohibited Sullivan's questioning, and such was an abuse of discretion.

v. the error was harmless

 Recent case law has emphasized that improper limitation of questioning during
voir dire is subject to a harm analysis. Gonzales v. State, 994 S.W.2d 170, 171 (Tex.
Crim. App. 1999); see also Cena v. State, 991 S.W.2d 283 (Tex. Crim. App. 1999). The
State's brief urges that the harm analysis to be employed by this Court is the same as that
for an erroneous denial of challenge for cause, citing Anson v. State, 959 S.W.2d 203
(Tex. Crim. App. 1997).

 We have recently recognized that the harm analysis we have traditionally
applied to the erroneous denial of a defendant's challenge for cause also
applies to the erroneous prohibition of proper questioning of individual
prospective jurors. Janecka v. State, 937 S.W.2d 456, 470-471 & 471 n. 9
(Tex. Crim. App. 1996). For the erroneous denial of challenges for cause, a
defendant is harmed only if (1) he exhausts all of his peremptory
challenges, (2) he requests more challenges, (3) his request is denied, and
(4) he identifies an objectionable person seated on the jury on whom he
would have exercised a peremptory challenge. Narvaiz v. State, 840
S.W.2d 415, 427 (Tex. Crim. App. 1992), cert. denied, 507 U.S. 975, 113
S.Ct. 1422, 122 L.Ed.2d 791 (1993).


Id. at 204. In both Anson and Janecka, however, the questioning was targeted toward
identified members of the venire pool. As the blind use of peremptory challenges could
not have remedied the complaint here, we think it appropriate to use a more traditional
harm analysis.

 Non-constitutional errors that do not affect substantial rights do not warrant
reversal. Lee v. State, 21 S.W.3d 532, 538 (Tex. App.--Tyler 2000, no pet.); Tex. R. App.
P. 44.2(b). This Court must examine the record as a whole to determine whether error
influenced the jury verdict. Lee, 21 S.W.3d at 538-39. An error is harmless if the
reviewing court determines that no substantial rights of the defendant were affected
because the error did not influence or had only a slight influence on the verdict. Id. at 539
(citing Fowler v. State, 958 S.W.2d 853, 865 (Tex. App.--Waco 1997), aff'd, 991 S.W.2d
258 (Tex. Crim. App. 1999)). However, a substantial right is affected when the error has
a substantial and injurious affect or influence in determining the jury's verdict. Id. (citing
King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). If this Court cannot say that
the judgment was not substantially swayed by the error, it is impossible to conclude that
substantial rights were not affected. Id.

 We note that prospective jurors were asked and did agree that they could follow
the instructions given in the charge. Castillo does not put forth any actual argument that
they could not consider each element of the crime as charged. Further, the record reveals
legally and factually sufficient evidence to support the conviction. Thus, we find nothing
from which we can infer that the judgment was swayed by the error and must conclude
that Castillo's substantial rights were not affected in light of the question which the trial
court allowed, as it encompassed the element with which Sullivan was concerned. The
third point of error is overruled.

The trial judge was within her discretion to not

allow the stipulation as to ownership of the handgun

 Castillo's fourth point claims error in admission of evidence proving Castillo's
ownership of the gun used in the drive-by, where Castillo offered a stipulation that he
owned the gun and knew how to load and operate it. The trial court refused to allow the
stipulation, expressing concern that evidence indicated the gun was stolen, noting, "I
don't think we're going to be able to allow the stipulation if he's not the owner of the
gun. I don't think I can allow him to stipulate he's the owner." She stated that the
proposed stipulation would have allowed Castillo to "commit perjury." The court then
admitted testimony from Officer Triplett about the gun, finding it more probative than
prejudicial.

 Castillo argues on appeal that "ownership" as defined in the Texas Penal Code
would have included the manner in which he possessed the gun. "Owner," according to
section 1.07(35), means a person who "has title to the property, possession of the
property, whether lawful or not, or a greater right to possession of the property than the
actor." Tex. Penal Code Ann. § 1.07(35)(A) (Vernon 2003). We need not reach the
issue of whether the content of the stipulation was proper, however, as the State was
within its rights to oppose the stipulation.

 A stipulation is in the nature of a contract. See Howeth v. State, 645 S.W.2d 787,
789 (Tex. Crim. App. 1983). It is a mutual agreement and the proponent may not compel
the opponent to participate. (1) The State may adduce its testimony as it sees fit; it may or
may not agree to the stipulation. See Rodriguez v. State, 373 S.W.2d 258, 259 (Tex.
Crim. App. 1963), accord Jones v. State, 843 S.W.2d 487, 500-01 (Tex. Crim. App.
1992); Buitron v. State, 519 S.W.2d 467, 471 (Tex. Crim. App. 1975). Thus, the State is
not prohibited from introducing evidence merely because the defendant was willing to
admit the facts sought to be proved. Ramirez v. State, 815 S.W.2d 636, 649 (Tex. Crim.
App. 1991).

 Here, the State did not agree to the stipulation. In the absence of the stipulation,
ownership and history of the gun was central to the State's proof. The fourth point of
error is overruled.

Evidence of prior offense was admissible

 Castillo's fifth point contends that the trial court erroneously admitted evidence of
an extraneous offense under the law of "chances" or to rebut a defensive theory, where
the offense occurred sixty-three months prior to trial and when he was a juvenile. Officer
Robert Weaver, a police officer from Hobbs, New Mexico, testified that he investigated a
drive-by shooting on October 27, 1996, at the house of Juan Mendez. Castillo was
charged with two counts: (1) shooting at or from a motor vehicle, and (2) shooting at a
dwelling or occupied building. A jury found him guilty of the offense of shooting at a
dwelling or occupied building and placed him in the New Mexico Boys School for an
"indeterminate period not to exceed two years." The charge of shooting at or from a
motor vehicle was dismissed by the court in that case.

 A trial judge's admission of an extraneous offense is to be given due deference and
be upheld absent an abuse of discretion. Montgomery v. State, 810 S.W.2d 372, 390-91
(Tex. Crim. App. 1990). Extraneous offenses are admissible to refute a defensive theory
raised by the accused. Cantrell v. State, 731 S.W.2d 84, 90-91 (Tex. Crim. App. 1987). 
On a more fundamental level in Texas courts, extraneous offenses are admissible for
proving intent to act on the part of the defendant. Tex. R. Evid. 404(b). Even without
entering the debate on "defensive theory," the State was permitted to present the
extraneous offense as evidence of intent, particularly where it was a material issue in the
case. Id. at 90.

 Although arguing that the time between the two offenses was sixty-three months, (2)
and was therefore too remote to be relevant, Castillo does little more than give one
example of another case where events "four years prior" and "over three years prior to
trial" were too remote. See Plante v. State, 692 S.W.2d 487, 495 (Tex. Crim. App. 1985). 
The State counters with other examples of longer periods allowed in other cases. See
Stringer v. State, 845 S.W.2d 400, 402 (Tex. App.--Houston [1st Dist.] 1992, pet. ref'd). 
We think simple comparison of unlike cases is dispositive of nothing in this calculus. 
Castillo does not otherwise argue how the trial judge abused her discretion by admitting
the evidence, and we cannot conclude that any abuse occurred. A limiting instruction was
included in the charge to the jury. Presumably, that instruction was followed by the
jurors.

 Even if the trial judge did err in admitting the testimony of Officer Weaver with
regard to the previous offense, the error would have been harmless. The harm claimed by 
Castillo was that he was sentenced to the maximum imprisonment and fine. The
determination of sentencing was after the punishment stage of the trial in which
extraneous offenses would have been permitted for the jury's consideration. See Tex.
Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon Supp. 2003). The fifth point of
error is overruled.

The evidence is both legally and factually sufficient

 In his sixth point of error, Castillo contends the evidence was legally and factually
insufficient to prove that he was guilty of engaging in organized criminal activity either
by having the intent to establish, maintain, or participate in a combination or in the profits
of a combination or as a member of a criminal street gang.

 The indictment alleges that Castillo violated section 71.02 of the Texas Penal Code
by engaging in organized criminal activity.


 § 71.02. Engaging in Organized Criminal Activity


 (a) A person commits an offense if, with the intent to establish,
maintain, or participate in a combination or in the profits of a
combination or as a member of a criminal street gang, he commits or
conspires to commit one or more of the following:


 (1) murder, capital murder, arson, aggravated robbery, robbery,
burglary, theft, aggravated kidnapping, kidnapping,
aggravated assault, aggravated sexual assault, sexual assault,
forgery, deadly conduct, assault punishable as a Class A
misdemeanor, burglary of a motor vehicle, or unauthorized
use of a motor vehicle; . . . .


Tex. Penal Code Ann. § 71.02(a)(1) (Vernon 2003). Specifically, Castillo was accused
of establishing or participating in a combination in the commission of deadly conduct or
committing the deadly conduct offense as a member of a criminal street gang.

 Section 71.01 defines a "combination" as "three or more persons who collaborate
in carrying on criminal activities." Tex. Penal Code Ann. § 71.01(a) (Vernon 2003). A
"criminal street gang" is defined as "three or more persons having a common identifying
sign or symbol or an identifiable leadership who continuously or regularly associate in the
commission of criminal activities." Tex. Penal Code Ann. § 71.01(d) (Vernon 2003).

 Castillo reminds this Court that the standard to be considered is one of ongoing
criminal activity. Nguyen v. State, 977 S.W.2d 450 (Tex. App.--Austin 1998), aff'd, 1
S.W.3d 694 (Tex. Crim. App. 1999). The Court of Criminal Appeals opinion affirming
that decision, however, also notes that "one may engage in organized crime by
committing one or more of the proscribed acts with the intent to establish a combination;
accordingly, the proscribed action may be the first actual crime committed by a member
of the combination." Nguyen, 1 S.W.3d at 697. "[I]f the evidence indicates that (1) a
defendant's accomplices had engaged in ongoing multiple criminal activities. . . and (2) a
defendant agrees to join the existing organized crime unit, knowing that it has committed
or will commit multiple criminal activities, he falls within the definition of engaging in
organized criminal activity, even if he is caught after committing a single criminal
offense." Nguyen v. State, 21 S.W.3d 609, 614 (Tex. App.--Houston [1st Dist.] 2000, pet.
ref'd). Upon review of the record, this Court finds that the evidence was sufficient to
support the conviction.

i. legal sufficiency

 In reviewing the legal sufficiency of evidence, this Court views the evidence in a
light most favorable to the verdict to determine whether any rational trier of fact could
find the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia,
443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Geesa v. State,
820 S.W.2d 154, 159 (Tex. Crim. App. 1991); Rivera v. State, 885 S.W.2d 581, 583 (Tex.
App.--El Paso 1994, no pet.). Viewing evidence in a light most favorable to the verdict
means that the reviewing court is to review the evidence as it is already weighed by the
trier of fact's verdict, therefore deferring to the trier of fact's determinations of weight
and credibility. See Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). The
Court of Appeals is not charged with determining whether the evidence establishes guilt
beyond a reasonable doubt. Stoker v. State, 788 S.W.2d 1, 6 (Tex. Crim. App. 1989),
cert. denied, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990); Dwyer v. State, 836
S.W.2d 700, 702 (Tex. App.--El Paso 1992, pet. ref'd). The fact finder, here the jury, is
the sole judge of the weight of the evidence and may choose to believe all, some, or none
of it. Moore v. State, 935 S.W.2d 124, 126 (Tex. Crim. App. 1996). We do not resolve
any conflict in fact, weigh any evidence, nor evaluate the credibility of any witnesses. 
Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); Rivera, 885 S.W.2d at
583. Further, a reviewing court is not to disturb the trier of fact's decision unless it is
found to be irrational or unsupported by more than a "mere modicum" of the evidence. 
See Moreno, 755 S.W.2d at 867.

 Castillo's argument focuses on the finding of a combination or criminal street gang
rather than the underlying offense of deadly conduct, and this analysis will likewise
concentrate upon that element. It is undisputed that Castillo and Canava are members of
the East Side Bloods. In Castillo's case, this membership is evidenced not just by his
booking report, but also by his red clothing and his numerous gang-related tattoos. 
Savage was no longer a member of the gang, but he still had a gang tattoo. Savage
testified that when gang candidates are initiated, the process often involves criminal
activity, including drive-by shootings. It is also undisputed that the Bloods engage in
criminal activities. When Castillo tied a red bandanna around his head, Barrientes tied on
a white bandanna. One cannot wear the gang colors until he is a gang member. This, in
addition to the fact that Barrientes was guiding the vehicle with directions, suggests that
the three men were participating in a gang activity, perhaps the initiation of Barrientes
into their organization establishing his affiliation with the group. When read in a light
most favorable to the verdict, this Court cannot say that the jury's finding that the men
were working together in violation of section 71.02 was irrational or unsupported by the
evidence.

ii. factual sufficiency

 This Court of Appeals reviews factual sufficiency of the evidence to support a
verdict by viewing all the evidence in a neutral light, rather than in a light most favorable
to the prosecution, and may reverse only if the proof of guilt is so obviously weak as to
undermine confidence in the jury's determination, or the proof of guilt, although adequate
if taken alone, is greatly outweighed by contrary proof. Johnson v. State, 23 S.W.3d 1, 6-7, 11 (Tex. Crim. App. 2000); Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996);
Drost v. State, 47 S.W.3d 41, 45 (Tex. App.--El Paso 2001, pet. ref'd). This Court
reviews the evidence weighed by the jury that tends to prove the existence of the
elemental fact in dispute and compares it with the evidence that tends to disprove that
fact. Johnson, 23 S.W.3d at 7 (citing Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim.
App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997)). In its
review of factual sufficiency, this Court is authorized to disagree with the fact finder's
determination; however, we must employ appropriate deference to prevent substituting
our judgment for that of the fact finder, and any evaluation should not substantially
intrude upon the fact finder's role as the sole judge of the weight and credibility given to
witness testimony. Id. (citing Clewis, 922 S.W.2d at 133; Jones, 944 S.W.2d at 648). 
This Court's authority to disagree is thus limited to situations where the record clearly
indicates such a step is necessary to arrest the occurrence of manifest injustice. Johnson,
23 S.W.3d at 9; Drost, 47 S.W.3d at 45. Evidence may be found to be factually
insufficient to support a verdict in two ways: (1) it may be so weak as to be clearly wrong
and manifestly unjust, or (2) an adverse finding of the fact finder may be against the great
weight and preponderance of the evidence. Johnson, 23 S.W.3d at 11; Drost, 47 S.W.3d
at 45.

 A review of the record does not present much evidence to challenge a finding that
the men worked in combination. The only adverse evidence presented by the defense was
that the men did not talk about the shooting prior to the event. Placing all the evidence in
a neutral light, therefore, does not raise any question even suggesting that the jury's
findings were against the great weight of the evidence or that a finding was unjust. That
it was not discussed that they should go shoot up the Ensor's house while in the car does
not lessen the likelihood that at least three of the men knew what was going to happen
that afternoon. They prepared as they approached the Ensor residence. Barrientes gave
directions as Canava drove. Castillo and Barrientes loaded the weapons and placed them
in firing positions in the car. Canava and Barrientes shot at the house. Nothing suggests
otherwise. The evidence is factually sufficient to support the conviction for engaging in
organized criminal activity. The sixth point of error is overruled.Conclusion

 For the foregoing reasons, the judgment of the trial court is affirmed.


 SUSAN LARSEN, Justice

July 17, 2003


Before Panel No. 3

Barajas, C.J., Larsen, and Chew, JJ.


(Do Not Publish)

1. There is a narrow exception for jurisdictional matters such as those in cases allowing
stipulation to previous convictions for driving while intoxicated offenses that allows a court to
exercise jurisdiction over the case. See, e.g., Tamez v. State, 11 S.W.3d 198, 201 (Tex. Crim.
App. 2000). That exception is not implicated in the current case.
2. Actually, 63 months elapsed between the first offense and trial on the second offense. 
The first shooting occurred on October 27, 1996, the shooting here was on February 5, 2000, a
little over 39 months later.